Filed 5/25/21  P. v. Sidney CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LISA SIDNEY,<br><br>Defendant and Appellant. | D077136<br><br><br><br>(Super. Ct. No. SCD266565) |

APPEAL from an order of the Superior Court of San Diego County, Kenneth K. So, Judge.  Affirmed.

John Lanahan for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

For her role in a scheme with her husband to defraud elderly victims, defendant Lisa Sidney was placed on five years' formal probation and ordered to pay more than $2.5 million in restitution.  The trial court later revoked her probation, finding she concealed assets to avoid paying restitution, made

willful misstatements on a statement of assets, and failed to file tax returns. Sidney contends the trial court erred in revoking probation. We affirm.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### *Charges and Guilty Plea*

Sidney and her husband, William Phillips (Husband), defrauded elderly victims into purchasing gemstones as investments at severely inflated prices. The prosecution charged Sidney and Husband with seven counts of theft of more than $950 from an elder (Pen. Code, § 368, subd. (d))[2] and three counts of grand theft (§ 487, subd. (a)). Four of the counts included enhancement allegations that the theft caused losses exceeding $65,000 (former § 12022.6, subd. (a)(2)), and four included allegations that the theft caused losses exceeding $200,000 (*ibid.*, subd. (a)(1)).

In July 2017, Sidney and Husband pleaded guilty to three counts of theft from an elder, one count of grand theft, and admitted to two of the $65,000 enhancement allegations and two of the $200,000 enhancement allegations. The balance of charges and enhancement allegations were dismissed.

### *Sentence and Restitution*

In September 2017, the trial court sentenced Husband to a split sentence of nine years four months, with four years to be served in local custody and the balance to be served under community supervision.

---

[1] Sidney asserts in a petition for writ of habeas corpus that she received ineffective assistance of counsel from the deputy public defender who represented her at the revocation hearing (her retained counsel having withdrawn about one year earlier). In a separate order, we deny the petition.

[2] Undesignated statutory references are to the Penal Code.

At the same time, the trial court placed Sidney on formal probation for five years, with the condition that she serve 365 days in local custody (120 days in jail, and the balance under house arrest). The court allowed Sidney to defer the custodial term until after Husband completed his so that one of them would always be available to care for Sidney's ailing 99-year-old mother (Mother).

The trial court also ordered Sidney and Husband to pay victim restitution of $2,553,934.95.

In July 2017, Sidney and Husband sold their residence and applied the $1,077,000 in proceeds toward restitution.

In October 2017, the trial court accepted an agreement among Sidney, Husband, the prosecutor, and the victims, under which Sidney and Husband would pay only 75 percent of the total restitution amount—thus, about $1,828,350—if they paid it by April 2018. Sidney and Husband did not meet this deadline.

In September 2018, Husband offered to pay off the remaining restitution in exchange for the prosecution "agree[ing] to reduce his sentence and spare [Sidney] from some or all of her custodial sanction." This led the prosecution to reopen its investigation regarding Sidney and Husband's finances. The trial court directed Sidney to file a statement of assets.

On October 2, 2018, Sidney filed her statement of assets.

### Petition to Revoke Probation

In January 2019, the prosecution petitioned the court to revoke Sidney's probation. The prosecution maintained Sidney violated her obey-all-laws probation condition by (1) concealing property to avoid paying restitution, in violation of section 155.5, subdivision (b); (2) making a willful misstatement of material fact on her statement of assets, in violation of

3

section 1202.4; and (3) concealing income to evade taxes, in violation of Revenue and Taxation Code section 19705, subdivision (a)(4).

The prosecution identified in its petition two sources of income Sidney failed to disclose. First, a limited liability company in which she and Husband held interests (Mellmanor LLC) had sold a piece of real property for $1,155,000, resulting in net sales proceeds of about $310,000. Sidney promptly withdrew these funds in the form of cash, money orders, and cashier's checks. Second, the Department of Veterans Affairs (VA) made monthly deposits on Husband's behalf into a bank account he jointly held with Sidney.

Sidney opposed the petition, explaining Mother was the true owner of the property held by the LLC. Sidney handled the sale because she held a power of attorney for Mother, who was 100 years old, was "not mobile," and could "speak[ ] only in limited ways." Sidney insisted she managed the sales proceeds "only . . . for the benefit of her mother," and that her (Sidney's) "income and expense[s] remain the same as stated on" her statement of assets.

### *Revocation Hearing*

After granting a defense request for a continuance, the trial court held a two-day revocation hearing in August 2019. At the outset, counsel advised the court they would be focusing on ownership of the property sold by the LLC because "[o]nce we figure that out, that will likely resolve everything else."

#### *Prosecution Evidence*

The prosecution's primary witness was Gary Helson, an investigator in the district attorney's office with about 46 years' experience. He testified

4

about his investigation into the LLC, the property, its sale, and disposition of the sales proceeds.

Mellmanor LLC was established in 2003 for the stated purpose of real estate investment. The LLC's December 2003 operating agreement stated that the LLC's profits and losses were allocated 50 percent to Sidney and 50 percent to Husband. Letters between the LLC and its counsel in that timeframe confirmed this allocation and clarified that Mother "would have no ownership. She would only be a nominal member." Sidney and Husband made a capital contribution to the LLC of approximately $330,000.

The property at issue is a four-unit apartment building on Mellmanor Drive in La Mesa (the Property). In 2003, Sidney provided the $10,000 down payment for the Property. The balance of the purchase price, which is not specified in the appellate record, was paid with a mortgage in Mother's name. Title to the Property was initially put in Mother's name, but she transferred title to Mellmanor LLC two days later.

An independent loan modifier testified she worked with Sidney in 2014 in an unsuccessful attempt to modify the mortgage on the Property. The loan modifier determined that although the mortgage was in Mother's name, Mellmanor LLC held title to the Property, and Sidney and Husband owned the LLC equally. The loan modifier testified that Sidney "clearly told" her not to "let the bank know" the true ownership structure—"[t]hat [Sidney]'s the owner, not the mom"—"because it's like opening a can of worms." During the attempted loan modification, Mother provided two letters confirming she had no ownership in Mellmanor LLC, and that Sidney and Husband owned it equally.[3]

---

[3] In one letter, Mother wrote that she "ha[s] no ownership, interest, or percentage in" Mellmanor LLC. In the other, she wrote that she "ha[s] no

Investigator Helson testified that Mellmanor LLC's records indicated the Property generated about $103,000 in rental income in 2016. Based on those records and tenant interviews,[4] he believed the Property remained continuously rented from 2016 until the LLC eventually sold it in 2018.

In September 2017, Mellmanor LLC nominated Sidney as its "managing member with authority to act as sole signor . . . on any loan-related documents." That same month, the LLC borrowed $320,000 against the Property from a private lender. Sidney signed all the loan documents as managing member.

In February 2018, Mellmanor LLC sold the Property for $1,155,000 to a relative of the private lender. After paying off loans against the Property, the LLC received net proceeds of $311,664, which were deposited into the LLC's account at Chase Bank (Chase).

Within approximately one hour of this deposit, Sidney went to a Chase branch and withdrew more than $310,000 in the following manner: $5,000 in cash; 15 money orders for $1,000 each, payable to Mother; and 21 cashier's checks totaling $290,703, payable to various individuals and entities.

---

percentage or interest other than managing member. The percentage is divided 50 percent to Lisa Sidney and 50 percent to [Husband] as an ownership of the LLC[ ]."

4        The trial court allowed the parties to introduce reliable hearsay. (See *People v. Guilford* (2014) 228 Cal.App.4th 651, 660 ["Reliable hearsay is deemed sufficient for purposes of revoking probation . . . ."]; *People v. Brown* (1989) 215 Cal.App.3d 452, 454 ["As long as hearsay testimony bears a substantial degree of trust-worthiness it may legitimately be used at a probation revocation proceeding."].) Sidney does not contest the admissibility of any evidence.

Investigator Helson testified about the disposition of the cashier's checks.[5]  The first check was payable to Sidney and Mother's landlord for $49,600 (equivalent to eight months' rent at $6,200/month), but Sidney exchanged the check for six other checks—two to the landlord for $6,200 each, and four to Mother totaling $37,200.  The checks to Mother appeared to have been endorsed by Sidney.

Five checks for $25,000 each ($125,000 in total) were payable to a construction worker in Los Angeles with whom Sidney had spoken about working on a home Mother owned there.  However, none of these checks were used for that purpose—one was deposited into Sidney and Mother's joint bank account, three remained unnegotiated one year later, and one was exchanged for two more checks (one for $5,000 payable to Mother, the other for $20,000 payable to a different construction worker in Los Angeles).[6]

Three checks totaling $50,000 (two for $20,000, one for $10,000) were payable to the IRS.  One of the $20,000 checks was never negotiated, and the other was deposited into an account Sidney jointly controlled.  Sidney exchanged the $10,000 check for a check payable to Mother, which Sidney deposited into an account she jointly controlled.

One check for $2,500 was payable to Armando Ibarra, Sr., an accountant Sidney and Husband hired in 2017 "to update her tax records."

---

[5]    Sidney's counsel reiterated his view that it was unnecessary to go through the checks "because if it turns out that [Mother] owns [the Property], . . . [a]ll the money would be" Mothers and there would be no "need to spend . . . hours going through . . . checks . . . ."

[6]    The second contractor told Investigator Helson that Sidney had paid him $40,000 toward a $90,000 renovation project on Mother's house.  The work did not include making the house handicapped accessible.

However, Ibarra stated he "did not complete any tax record for them" because Sidney "never provided him the information" he needed.

Many of the cashier's checks were stamped on the back with "Not Used for Purpose Intended," which banks use "[w]hen the check is not negotiated by the person it's made out to." The funds from these checks generally were deposited into bank accounts Sidney jointly controlled.

All told, about $120,000 worth of cashier's checks remained unnegotiated one year after Sidney drew them.

Investigator Helson also testified about apparent inaccuracies in Sidney's statement of assets. Sidney disclosed three bank accounts (two joint with Mother, one joint with Husband) at three different banks with a total balance of $6,441.54. However, additional banking records obtained through search warrants revealed that Sidney controlled 13 accounts at four banks, with assets totaling $24,826.07. Also, a bank statement for the joint account with Husband showed that about two weeks before Sidney filed her statement of assets, she deposited and immediately withdrew $74,600.

The statement of assets also listed Sidney's only source of income as $1,566 in monthly social security benefits. However, Investigator Helson discovered that Husband received a monthly VA benefit of $1,182.52, $500 of which was allocated to Wife as a dependent.

Additionally, Sidney checked boxes on the statement of assets form representing that no one was "holding assets for [her]" and that she had not "disposed of or transferred any assets since [her] arrest on this matter." Yet, Sidney did not disclose the rental income or sales proceeds from the Property, or that she had deposited $9,000 into Husband's inmate account at the county jail over the preceding 10 months.

8

Based on his "overall investigation," Investigator Helson concluded Sidney and Husband conducted their financial affairs in a "very deceitful and manipulative" manner.

A special agent from the Franchise Tax Board (FTB) testified about Mellmanor LLC's tax history and reporting obligations. The last year for which the LLC filed tax returns was 2013. The agent explained that an LLC is required to file an informational return and pay a minimum tax of $800 each year "[j]ust for doing business in California." Mellmanor LLC would also be required to report rental income and net proceeds from the sale of property. Although the agent initially addressed rental income in a hypothetical question about rental income over $100,000, he testified more generally that Mellmanor LLC would also have to report rental income without regard to any threshold. The agent clarified that the FTB deems all members of an LLC responsible for filing the entity's tax returns, unless the members agree otherwise. He noted the Secretary of State suspended Mellmanor LLC in July 2018, likely because the FTB presumed from the lack of tax returns that the LLC was no longer operating. To reinstate its status, Mellmanor LLC would have to file the appropriate tax returns.

*Defense Evidence*

During the prosecution case, defense counsel cross-examined Investigator Helson regarding ownership of Mellmanor LLC. Counsel presented Exhibit I, which purported to be minutes of Mellmanor LLC's annual meeting on May 20, 2016, during which the members "invest[ed] a hundred percent membership and ownership in [Mother]." Investigator Helson explained he did not believe the minutes were genuine because he had not seen them during his investigation, and they indicated the meeting occurred at the Chula Vista office of accountant Ibarra, whom Sidney hired in

9

2017 (after the date of the purported annual meeting). When defense counsel insinuated Ibarra suffered from dementia and that his son was therefore running the firm, Investigator Helson vehemently disagreed: "I've interviewed him in person. I don't think he has dementia at all. . . . [H]e seemed to have complete control of his mental faculties."

The only witness the defense called was Mother's caregiver. She explained that although Mother was unable to talk, she could communicate by nodding in response to questions. Mother appeared particularly responsive to Sidney. The caregiver acknowledged, however, that Mother was physically unable to write.

*Prosecution's Rebuttal Evidence*

On the second day of the evidentiary hearing, the prosecution reopened its case to present additional testimony from Investigator Helson about the purported LLC meeting minutes.

Investigator Helson testified he visited Ibarra at his Chula Vista office that morning. The accountant "was very coherent and responsive." Ibarra confirmed through his records that Sidney and Husband first retained him in October 2017, and "[h]is office had never had any contact prior to that." Ibarra insisted no Mellmanor LLC meetings had ever occurred at his office. When shown the purported meeting minutes, Ibarra stated he believed the meeting "never took place, not at [his] address."

*Trial Court's Ruling and Sidney's Statement*

After hearing argument, the trial court found Sidney in violation of probation on the three charged grounds. Although the court clarified it was "making this ruling . . . apart from the testimony" about the purported meeting minutes, the court found it "troubling . . . to have a document that talks about a meeting on May 20th, 2016, when you have testimony

10

indicating [the accountants] weren't engaged until 2017. That is troubling to the court."

Sidney then addressed the court (against the advice of counsel). Sidney asserted Mother provided all the funds used to acquire the Property, and, thus, Mother was entitled to all the sales proceeds. Sidney maintained she used the sales proceeds only for Mother: "None of it was for me. None of it went to me personally. It was for my mom because it's her money." Sidney explained she failed to list certain accounts on her statement of assets because they were essentially dormant and had only nominal balances. And she asserted the LLC had not paid taxes because the prosecution seized its records and she could "never, ever get someone to help . . . with the tax returns."

Sidney explained she promptly withdrew the sales proceeds from Mellmanor LLC's account because she believed the money belonged to Mother, and was aware the prosecutor had contacted escrow about seizing the funds to apply toward restitution. She withdrew the bulk of the proceeds as cashier's checks "based on situations [she] could see coming up," such as "owing the IRS for the house [she] sold" to pay toward restitution.

Sidney stated Mother transferred the Property to Mellmanor LLC so that Mother, Sidney, and Husband would each be one-third owners. Sidney also explained that about half of the proceeds from the $320,000 private loan in 2017 went toward caring for Mother, and the other half went toward Husband's legal defense fees and restitution.

Finally, Sidney explained that she and Mother paid $6,200 per month in rent because it was difficult to find a place to accommodate Mother's physical limitations, and most landlords were reluctant to rent to a felon.

After hearing from Sidney, the trial court reiterated its findings that she violated probation by concealing property to avoid restitution, making a willful misstatement of material facts on her statement of assets, and failing to file tax returns. Consequently, the court revoked Sidney's probation.

**Sentencing Following Revocation**

Between the revocation hearing and the sentencing hearing, Sidney and Husband paid off the outstanding restitution balance. The court reinstated Sidney's original five-year probation term, with the new condition that she serve 365 days in actual custody and waive any custody credits.

**DISCUSSION**

Sidney contends the trial court erred by revoking her probation. We disagree.

A court is authorized to revoke probation "if the interests of justice so require and the court, in its judgment, has reason to believe . . . the person has violated any of the conditions of their supervision . . . ." (§ 1203.2, subd. (a).) "The standard of proof in a probation revocation proceeding is proof by a preponderance of the evidence." (*People v. Urke* (2011) 197 Cal.App.4th 766, 772 (*Urke*).)

"We review a probation revocation decision pursuant to the substantial evidence standard of review [citation], and great deference is accorded the trial court's decision, bearing in mind that '[p]robation is not a matter of right but an act of clemency, the granting and revocation of which are entirely within the sound discretion of the trial court. [Citations.]' [Citation.] [¶] 'The discretion of the court . . . will not be disturbed in the absence of a showing of abusive or arbitrary action. [Citations.]' [Citation.] 'Many times circumstances not warranting a conviction may fully justify a court in

12

revoking probation granted on a prior offense. [Citation.]' " (*Urke, supra,* 197 Cal.App.4th at p. 773.)

" 'When considering a challenge to the sufficiency of the evidence . . . , we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

Substantial evidence supports the findings on which the trial court revoked Sidney's probation.

Regarding the first ground for revocation, substantial evidence supports the finding that Sidney violated section 155.5 by "sell[ing], convey[ing], assign[ing], or conceal[ing] . . . her property with the intent to lessen or impair . . . her financial ability to pay . . . restitution." (§ 155.5, subd. (b).) Sidney essentially concedes the ownership issue in her writ petition, and the appellate record supports the concession.[7] Mellmanor

---

[7] Sidney acknowledged in her petition: "There was considerable evidence to support a claim that the property had been converted to the use of Ms. Sidney and her husband. Ms. Sidney was the managing partner. Documents filed by Mellmanor, LLC listed her and her husband as each having 50% ownership, and none to [Mother]. Her mother had given Ms. Sidney power of attorney in 2009. [Mother] was severely disabled and could not communicate

13

LLC's records from 2003 established Sidney held a 50-percent ownership interest; letters from the LLC's counsel in 2004 confirmed this interest; Sidney told the loan modifier the same thing in 2014; Mother wrote two letters in 2014 confirming Sidney still held a 50 percent interest and disclaiming any interest of her own; and Sidney acknowledged during the revocation hearing that she once held an interest in the Property.

Circumstantially, the fact that Sidney and Husband borrowed against the Property to pay Husband's legal fees and victim restitution, and that Sidney earmarked a portion of the sales proceeds for her personal tax liability strongly support the finding that Sidney held an interest in the Property (or its sales proceeds) worthy of disclosure.

In the face of this powerful evidence establishing Sidney's ownership interest in the Property, the trial court was rightly "troubl[ed]" by the seemingly fraudulent LLC meeting minutes that Ibarra refuted outright. The validity of those minutes is further undermined by Sidney's baseless accusation that Ibarra suffered from dementia.

As for her intent in concealing her interest in the Property, Sidney expressly told the trial court she promptly withdrew the funds from the LLC's bank account to prevent the prosecutor from seizing and applying them toward restitution. Sidney's elaborate "shell game" with the 21 cashier's checks—many of which were not used for their stated purpose, and about $120,000 worth of which remained unnegotiated one year later— supports an inference that she was concealing the funds to prevent them from being applied toward restitution.

---

with anyone except Ms. Sidney. All of these showed that the Mellmanor property was controlled by Ms. Sidney, who sold it."

14

Regarding the second ground for revocation, substantial evidence supports the finding that Sidney made willful misstatements on her statement of assets. (See § 1202.4, subd. (f)(5) ["A defendant who willfully states as true a material matter that he or she knows to be false on the disclosure required by this subdivision is guilty of a misdemeanor . . . ."].) Putting aside her failure to disclose numerous bank accounts and current balances, Sidney also failed to disclose: rental income from the Property; $500 in monthly VA benefits that she received through Husband; about $120,000 in cashier's checks that remained unnegotiated about one year after Sidney drew them; $9,000 that she deposited into Husband's inmate account; and $74,600 that she cycled through one of her accounts the month before she filed the statement of assets. And despite the sale of the Property, Sidney checked a box on the form representing that she had not "disposed of or transferred any assets since [her] arrest." It was within the trial court's discretion to find these misstatements material and willful.

Finally, substantial evidence supports the finding that Sidney violated Revenue and Taxation Code section 19705, subdivision (a)(4), by failing to file tax returns for rental income and sales proceeds generated by the Property after she was placed on probation. Investigator Helson testified the Property generated approximately $103,000 in rental income in 2016. Although this was before the court placed Sidney on probation, Investigator Helson also testified that the Property remained consistently rented until it sold in 2018—after Sidney was placed on probation. Thus, it is reasonable to infer Sidney failed to file tax returns accounting for rental income earned while she was on probation.

Sidney's assertion that there is a $100,000 threshold before rental income must be reported is based on a misunderstanding of the hypothetical

15

question to the FTB special agent. The agent did not testify that such a threshold exists, nor has Sidney cited any authority to support the claim.

Also while she was on probation, Sidney failed to file a tax return reporting the LLC's sale of the Property. She argues there is "no support" for the proposition that the sale of the Property resulted in "reportable income." However, the trial court could reasonably infer under the preponderance standard of proof that the Property appreciated in value over the 15 years the LLC owned it. And, in any event, the FTB agent testified that the sale needed to be reported in a tax return.

Sidney argues that even assuming she was required to file tax returns, her failure to do so was not willful; rather, she was *unable* to file them because the prosecutor had seized her records. However, Sidney has not shown that she ever asked for the return of the records (or copies of them) so she could file tax returns. Thus, the trial court could reasonably have found her failure to be willful.

**DISPOSITION**

The order is affirmed.

HALLER, Acting P. J.

WE CONCUR:


GUERRERO, J.


DO, J.

16